IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Rebecca Lester-Pierce, | ) | Civil Action No.  2:15-cv-00730-MGL-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Carolyn W. Colvin, Acting | ) | **OF MAGISTRATE JUDGE** |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This case is before the Court for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The Plaintiff, Rebecca Lester-Pierce, brought this action pursuant to Section 205(g) of the Social Security Act, as amended, (42 U.S.C. Section 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security Administration regarding her claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.

## RELEVANT FACTS AND ADMINISTRATIVE PROCEEDINGS

Plaintiff was 48 years old on her alleged disability onset date of April 24, 2008. (R. at 18, 28.) She alleged disability due to cervical and lumbar degenerative disc disease and spondylosis, migraine headaches, a gastric dysmotility disorder, and anxiety and depression. (R. at 20, 443.) Plaintiff has a ninth grade education and past relevant work as a textile machinery operator. (R. at 27, 66.)

Plaintiff protectively filed an application for DIB and SSI on May 7, 2008. (R. at 18.) Her applications were denied initially and on reconsideration. (R. at 18.) After a hearing before an Administrative Law Judge (ALJ) on January 8, 2010, the ALJ issued a decision on July 14, 2010, in

---

[1] A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

which the ALJ found that Plaintiff was not disabled. (R. at 18-29.) The Appeals Council denied Plaintiff's request for review, (R. at 1-6), and on August 10, 2012, Plaintiff filed suit in the United States District Court for the District of South Carolina. *See Lester v. Commissioner of Social Security*, Civ. A. No. 2:12-cv-02296-MGL. In an Order dated April 18, 2013, the Honorable Mary G. Lewis granted the Commissioner's Motion to Remand. (*See* Dkt. No. 17 in Civ. A. No. 2:12-cv-02296-MGL.)

While *Lester v. Commissioner of Social Security*, Civ. A. No. 2:12-cv-02296-MGL, was pending, ALJ Lamb issued a favorable decision on March 7, 2013, finding Plaintiff disabled as of the onset date of that claim, July 15, 2010. (*See* R. at 524-32.) However, after the remand in *Lester v. Commissioner of Social Security*, Civ. A. No. 2:12-cv-02296-MGL, ALJ Lamb conducted a hearing on October 25, 2013, for the period of April 24, 2008 to July 14, 2010. (*See* R. at 463-92.) In a decision dated January 17, 2014, ALJ Lamb found that Plaintiff was not disabled from April 24, 2008 through July 14, 2010. (*See* R. at 440-57.) The Appeals Council denied Plaintiff's request for review (R. at 418-21), making the ALJ's decision the Commissioner's final decision for purposes of judicial review.

In making the determination that the Plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.
>
> (2)    The claimant has not engaged in substantial gainful activity since April 24, 2008, her alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)    The claimant has had the following severe combination of impairments since her alleged onset date of disability: cervical and lumbar degenerative dis[c] disease and spondylosis, migraine headaches, gastric dysmotility disorder, anxiety and depression (20 CFR 404.1520(c) and 416.920(c)).
>
> (4)    During the period in question in this case, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

>     (5)    After careful consideration of the entire record I find that, during the period from April 24, 2008 through July 14, 2010, the claimant had the residual functional capacity to lift and carry 10 pounds frequently and 20 pounds occasionally, to sit, stand and walk for approximately 6 hours in an 8 hour workday, to crawl occasionally, to perform all other postural activities frequently, to push and pull with her upper extremities and to reach overhead no more than frequently, with no environmental limitations except a need to avoid concentrated exposure to hazards, and with the claimant having the ability to concentrate, persist and work at pace at simple, routine repetitive tasks for at least two hour periods, with no more than occasional interaction with the general public.
>
>     (6)    During the period from April 24, 2008 through July 14, 2010, the claimant was able to perform her past relevant work as a production assistant/machine operator. This work did not require the performance of work-related activities that were precluded by the claimant's residual functional capacity during the period from April 24, 2008 through July 14, 2010 (20 CFR 404.1565 and 416.965).

(R. at 443-55.) The ALJ also made alternative findings. (*See* R. at 455-57.)

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). The Act also provides that supplemental security income (SSI) disability benefits shall be available for aged, blind, or disabled persons who have income and resources below a specific amount. *See* 42 U.S.C. § 1381 *et seq*. "Disability" is defined in the Act as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than" twelve months. *See* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); 42 U.S.C. § 1382c(a)(3)(A) (definition used in the SSI context).[2]

To facilitate a uniform and efficient processing of disability claims, the Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner

---

[2]"[T]he definition of disability is the same under both DIB and SSI . . . ." *Mason v. Colvin*, Civ. A. No. 9:12-1157-TLW-BM, 2013 WL 4042188, at *2 n.2 (citing *Emberlin v. Astrue*, Civ. A. No. 06-4136, 2008 WL 565185, at *1 n.3 (D.S.D. Feb. 29, 2008)).

must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Administration's official Listing of Impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520 (DIB context); 20 C.F.R. § 416.920 (SSI context). If an individual is found not disabled at any step, further inquiry is unnecessary. *See* 20 C.F.R. § 404.1520(a)(4) (DIB context); 20 C.F.R. § 416.920(a)(4) (SSI context); *see also Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if she can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. *See* SSR 82-62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5); 42 U.S.C. § 1382c(a)(3)(H)(I). She must make a prima facie showing of disability by showing that she is unable to return to her past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983); *see also Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

Once an individual has established an inability to return to her past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. *See Grant*, 699 F.2d at 191. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *See id.* at 191-92.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner "are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *see also Richardson v. Perales*, 402 U.S. 389 (1971); 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *Pyles v. Bowen*, 849

F.2d 846, 848 (4th Cir. 1988) (citing 42 U.S.C. § 405(g); *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "substantial evidence" is defined as:

> such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be less than a preponderance.

*Smith v. Chater*, 99 F.3d 635, 637-38 (4th Cir. 1996) (internal quotation marks and citations omitted).

Thus, it is the duty of this Court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **DISCUSSION**

The Plaintiff contends that the ALJ erred in failing to find her disabled. More specifically, Plaintiff contends the ALJ "improperly ignore[d] the opinion evidence" of her treating physician, Dr. Worsham, and "fail[ed] to provide adequate reasons for his credibility determination." (Dkt. No. 10 at 20, 31 of 36.)

### **A.    Treating Physician's Opinions**

Dr. Worsham is Plaintiff's long-term treating physician. (*See* R. at 447.) The record contains many treatment notes of Dr. Worsham as well as two statements of opinion. On September 24, 2008, Dr. Worsham completed a form related to Plaintiff's mental condition. (R. at 329.) Therein, he stated that she was being prescribed Xanax and Zoloft for her depression and anxiety. (R. at 329.) Dr. Worsham indicated that the medication has "helped" Plaintiff's condition and that he did not recommend psychiatric care. (R. at 329.) He indicated Plaintiff's thought process was "distractible" and her mood was "worried/anxious" and depressed. (R. at 329.) Dr. Worsham indicated Plaintiff exhibited an "obvious" work-related limitation due to her mental condition. (R. at 329.)

On February 7, 2011, Dr. Worsham wrote a statement discussing Plaintiff's impairments. (R. at 394-95.) He noted that he has been treating Plaintiff since March of 2003 and that her neck pain

"has progressively worsened over the years." (R. at 394.) He stated that an MRI of Plaintiff's neck, done on August 27, 2009, "shows a multiple level disc bulge with varying degrees of foraminal stenosis and neural impingement." (R. at 394.) He further stated that the disc bulge is inoperable because the bulge is at multiple levels, which also "decreases the potential efficacy of nerve block injections." (R. at 394.) He opined that Plaintiff "is going to suffer from chronic pain her neck indefinitely." (R. at 394.) Dr. Worsham further stated,

> Ms. Lester-Pierce's complaint[s] of chronic severe neck pain are consistent with her MRI imaging that shows neural impingement. Her clinical examination over time has been consistent with her reports and imaging. Over the years I have frequently palpated muscle spasms in and around her neck area. Her neck mobility is going to be affected by the time of day I see here [sic] and how much she has tried to do during the day. She will have greater range of motion on some days when she has been less active. However, the fact that she has sometimes had good range of motion in her neck on some days does not diminish the fact that she has a serious problem in her cervical spine that will greatly restrict her activities. I have advised her to use her upper body and neck as little as possible during the day, and when she has complied with my advice the range of motion in her neck could be quite good. It is the nature of her condition as evidenced by her MRI imaging that the more she uses her upper body for any kind of activity, the more she will experience muscle spasm in her neck.

> If Ms. Lester-Pierce attempted to work at any type of job that required her to use her arms or hands frequently, she would not be able to engage in this type of activity for even an hour before the spasms in her neck would cause her to need to be out of work for the rest of the day. If she were to engage in any type of activity that involved her upper body, she would experience interruptions to her concentration sufficient to frequently interrupt tasks for about 7 hours out of an 8 hour work day from her neck pain. That is to say, she might be able to engage in this type of activity for an hour or so, but then she would be in too much pain to continue for the rest of the day. She should not lift anything more than one pound either frequently or occasionally due to the possibility that her neck pain will be exacerbated. This is a chronic condition that will not improve. I can say that she has had these limitation[s] based on her MRI imaging alone, but my opinion is also substantiated and supported by physical examination and interview. Again, this is a problem that has occurred gradually over time. Therefore, it is hard for me to say exactly when it reached the level of severity described above. However, based on my long term experience with her I am confident that she worked for as long as she possibly could.

> On 12/11/08 I noted that there was nothing in the MRI of Ms. Lester-Pierce's lumbar spine that would indicate the degree of severity of low back pain that she was describing that day. I would like to clarify that I was referring to her lumbar MRI only. I was not referring to her primary cervical problem, and I was not doubting the credibility of her reports of pain. Rather, I was coming to the determination that the pain about which she was complaining that day was not likely coming from her low

back; and, therefore, it must be coming from some other source. We sent her for an abdominal MRI to further evaluate her. Ms. Lester-Pierce has always presented to me as fully credible. She does not engage in exaggerated pain behaviors, and her reports have always been consistent with objective findings.

Ms. Lester-Pierce has always been fully compliant with her treatment. She had allergic reactions to a number of pain medications. On one occasion, I had to reeducate her on the best way to manage her pain medications. She had discontinued Neurontin because it was making her dizzy. I reeducated her on using Neurontin so as to prevent the potential side effect of dizziness. On that occasion, when I referred to potential overuse of narcotic pain medications I was referring to accidental overuse rather than intentional. Again, this was an occasion where I needed to educate my patient on her pain medications. I have never had any indication that Ms. Lester-Pierce has been anything less than fully compliant with my treatment recommendations to the best of her ability. Overall, Ms. Lester-Pierce has been highly compliant with her treatment.

Ms. Lester-Pierce has a number of other medical issues that will periodically interfere with her ability to concentrate. She has long complained of headaches. Once we determined that her headaches were mostly related to her neck problem, we then focused our treatment on her neck. Because this was a chronic problem, and we were treating the cause, we did not address the headache issue at every visit. She does in fact continue to have headaches related to her neck pain. These headaches will periodically interfere with her ability to concentrate. Also, she continues to have difficulty with gastric dysmotility. This is a condition that can cause swelling of the intestinal lining that will cause pain, nausea, vomiting, weakness fatigue and bloating. She will continue to intermittently experience[] these symptoms, but her current medication is helping a good bit. These symptoms will periodically interfere with her ability to concentrate. Ms. Lester-Pierce also suffers from diffuse muscular pain that has been diagnosed as fibromyalgia. This will also interfere with her ability to concentrate.

It was pointed out to me that I once filled out a form that suggested that Ms. Lester-Pierce would not have problems with attention and concentration. At the time, I intended to impart that when I see her in the office she is paying attention to me and largely understanding what I am saying. However, she still frequently presents as anxious, tearful and upset in a way that is consistent with being in severe pain. She can listen to me and understand as she is sitting in my office inactive, but if she attempted to work she would suffer interruptions to concentration sufficient to frequently interrupt her pain for the reasons described above.

(R. at 394-95.)

In assessing Dr. Worsham's opinions, the ALJ stated, *inter alia*,

As already noted, Dr. Stephen Worsham is the claimant's family practitioner and primary treating source. His office notes support my conclusion that the claimant's cervical and lumbar pain was not disabling during the period in question. On

7

September 27, 2007 Dr. Worsham commented on the claimant's then-recent cervical and lumbar MRI's. He noted they showed some effacement of the thecal sac at C2-3 and L5-S1, but without disc herniation or "any neural foraminal difficulty" [emphasis added] (Exhibit 4F). On multiple office visits in 2008 Dr. Worsham noted the claimant's back was non-tender, with normal flexion and extension (Exhibits 4F and 6F). On December 11, 2008, Dr. Worsham commented that, after studying the MRI's and providing medical follow-along, he concluded there was "nothing to indicate the severity of the back pain that she feels diffusely [in the] perilumbar area" [emphasis added] (Exhibits 15F and B4F). While the claimant contends that her cervical area pain has been intense and debilitating since April 24, 2008, I note that Dr. Worsham characterized the claimant's neck discomfort as "**controlled cervical area pain**" on June 18, 2009 [emphasis added] (Exhibit B4F).

In August 2009, the claimant told Dr. Worsham that her pain medication was helping her. He opined that the claimant's pain was "fair to moderately controlled" by her medications (Exhibit 17F). Thus, Dr. Worsham was of the opinion that (1) nothing on the claimant's MRI scans showed any defect that could explain the pain complained of and (2) that the pain medications Ms. Lester was taking provided reasonable pain control. He has described the claimant's neck as "supple" (Exhibit 15F) and repeatedly noted that her back was non-tender, with flexion and extension within normal limits. On January 4, 2010, Dr. Worsham characterized the claimant's condition as fairly stable. He opined that she would have difficulty with ambulation, standing or persisting in one position for a prolonged period of time (Exhibit 19F). On September 3, 2010, Dr. Worsham observed the claimant was distraught about not getting on Social Security disability.

The record contains a letter from Dr. Worsham dated February 7, 2011 (Exhibit 21F). Although this letter is subsequent to the date that disability has already been established, Dr. Worsham discusses the claimant's condition before that point in time, so analysis is proper. Dr. Worsham noted he first saw the claimant in March 2003 and that cervical pain was her primary problem. The doctor noted the more the claimant uses her upper body, the more limited her cervical range of motion is. He thus said he advised the claimant to use her upper body "as little as possible." This admonition is so nebulous as to be worthless. Dr. Worsham goes on to say that he told the claimant she should not lift anything over one pound, either frequently or even occasionally, due to the "possibility" that her neck pain might be intensified. I find this 1 pound lifting limitation to be baseless. Dr. Worsham notes nothing as a basis for that limitation except the possibility the claimant's cervical pain might increase. Dr. Worsham points to nothing in the evidence of record to support such a lifting limitation. The September 2007 cervical MRI indeed showed a bit of thecal sac effacement at C2-3, but there were no disc herniations or neuroforaminal abnormality (Exhibit 4F). Another cervical MRI was run on August 29, 2011 (Exhibit 24F). There were disc bulges at C5-6 and C6-7, but there was no neuroforaminal compromise at either level. The fact that this cervical MRI was run after the period in question only weakens Dr. Worsham's case. One's level of degenerative dis[c] disease and neuroforaminal encroachment generally worsen over time or, at best, remain static. But even **after** the period in question, the claimant had no cervical neuroforaminal encroachment or cervical nerve root irritation. In his February 2011 letter, Dr.

Worsham admitted that the claimant's level of pain and limitation **occurred quite gradually and that it was hard to say when she became impaired** at the level he estimated with his lifting limitations. The above analysis persuades me that nothing in Dr. Worsham's February 7, 2011 letter demonstrates that the claimant was disabled at any time from April 24, 2008 through July 14, 2010.

. . .

I conclude that the claimant's depression and anxiety were not of disabling severity during the period from April 24, 2008 through July 14, 2010. Neither depression nor anxiety is mentioned frequently by Dr. Worsham in his notes. On June 5, 2008, the claimant told Dr. Worsham that her depression was a little worse than previously. At that point, Dr. Worsham started the claimant on Zoloft (Exhibit B4F). Dr. Worsham completed a Social Security mental limitation form on September 24, 2008. In that form, he characterized the claimant as distractible, depressed and worried. On the other hand, Dr. Worsham described the claimant's attention, concentration and memory all as "adequate." He was of the opinion the claimant had "obvious" psychological limitations, but he did not elaborate (Exhibit 9F). In Dr. Worsham's February 7, 2011 letter, he commented on his completion of the above Social Security form. In the letter, Dr. Worsham stated that what he meant was that the claimant's good attention/concentration was how she presented at his office during his examination of her. He stated that, were the claimant in a work environment, she would likely suffer concentration interruptions due to pain (Exhibit 21F). Even if we accept Dr. Worsham's interpretation of his September 2008 answers, the RFC I have arrived at in fact limits the claimant to simple, routine repetitive tasks where she would not have to exhibit concentration for more than two hours at a time. Moreover, note that Dr. Worsham opined that the claimant's concentration was limited due to pain, not psychological distress. Thus, the RFC covering the period in question is congruent with Dr. Worsham's assessment of the claimant's limitations. On September 30, 2010, the claimant told Dr. Worsham that she was distraught over losing her Social Security disability appeal. He described the claimant as anxious and upset (Exhibits 19F and B5F).

. . .

As for the opinion evidence, I note that no treating or examining source has ever found that the claimant is disabled or unable to work. As to the opinions, Dr. Worsham opined in a letter of February 7, 2011 that, if the claimant were required to use her arms or hands frequently for a period of 1 hour, the resulting neck spasms would require her to be out of work the remainder of the workday (Exhibit 21F). I afford that opinion little weight. Dr. Worsham is admittedly a treating doctor who has a longitudinal treatment history with the claimant. However, his opinion that 1 hour of upper extremity activity would lead to incapacitation for the remaining 7 hours of the workday is unsupported. It is a bald assertion not buttressed with any test results, examination results, imaging or the like. While it is clear the claimant indeed had cervical degenerative dis[c] disease during the period in question, Dr. Worsham nowhere explains why 1 hour of upper extremity activity would necessitate the claimant being off work for the rest of the day. Likewise, Dr. Worsham nowhere

explains why the claimant cannot lift and carry any more than 1 pound, nor concentrate more than 1 hour in an 8 hour workday. These unsupported opinions are due very little weight.

(R. at 447-53.)

Plaintiff contends the ALJ erred in rejecting Dr. Worsham's opinions because Dr. Worsham "did not need to say that [Plaintiff] was 'disabled' before his opinions could be believed." (Dkt. No. 10 at 26 of 36.) Plaintiff further asserts that Dr. Worsham's opinions "were adequately supported by the objective evidence of the record" and that the "opinions of the non-examining, state agency consultants were not deserving of more weight than Dr. Worsham's opinions." (Dkt. No. 10 at 27, 30 of 36.)

Under the regulations of the Social Security Administration, the Commissioner is obligated to consider all medical evidence and the opinions of medical sources, including treating physicians. 20 C.F.R. § 404.1545; *see also* 20 C.F.R. § 404.1527. The regulation, known as the "Treating Physician Rule," imposes a duty on the Commissioner to "evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Special consideration is to be given to the opinions of treating physicians of the claimant, based on the view that "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). Even so, "the rule does not require that the [treating physician's opinions] be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam ) (citing *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986)).[3] The Commissioner is obligated to weigh the findings and opinions of treating

---

[3]*But see* 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.").

physicians and to give "good reasons" in the written decision for the weight given to a treating source's opinions. SSR 96-2P, 1996 WL 374188, at *5; *see also* 20 CFR § 404.1527(c)(2).

The undersigned agrees with Plaintiff that Dr. Worsham "did not need to say that [Plaintiff] was 'disabled' before his opinions could be believed." (Dkt. No. 10 at 26 of 36.) However, the undersigned is of the opinion that the ALJ's statement that "no treating or examining source has ever found that the claimant is disabled or unable to work" is not listed by the ALJ as a reason to discount Dr. Worsham's opinions. (*See* R. at 453.) Before beginning his analysis of Dr. Worsham's opinion, the ALJ simply noted that "no treating or examining source has ever found that the claimant is disabled or unable to work." (R. at 453.) Plaintiff did not take issue with the truth of that statement. The undersigned finds no basis for reversal in this argument.

Plaintiff next argues the ALJ erred in rejecting Dr. Worsham's opinions because they "were adequately supported by the objective evidence of the record." (Dkt. No. 10 at 27 of 36.) As noted above, the ALJ afforded "little weight" to Dr. Worsham's opinion that if Plaintiff were required to use her arms or hands frequently for a period of 1 hour, the resulting neck spasms would require her to be out of work for the remainder of the workday. (R. at 453.) The ALJ concluded such an opinion is "unsupported" and a "bald assertion not buttressed with any test results, examination results, imaging or the like." (R. at 453.) The ALJ reached a similar conclusion with respect to Dr. Worsham's opinion that Plaintiff cannot lift and carry more than one pound or concentrate more than one hour in an eight-hour workday, stating that "[t]hese unsupported opinions are due very little weight." (R. at 453.)

Plaintiff contends the ALJ erred because Dr. Worsham's opinions "were adequately supported by the objective evidence." (Dkt. No. 10 at 27 of 36.) Specifically, Plaintiff points to the August 28, 2007 MRI of her cervical spine, and Dr. Worsham's statement that "It is in the nature of her condition as evidenced by her MRI imaging that the more she uses her upper body for any kind of activity, the more she will experience muscle spasm in her neck." (Dkt. No. 10 at 27 of 36; *see also* R. at 394.) Dr. Worsham refers to an MRI of Plaintiff's neck done on August 27, 2009, indicating that MRI

"shows a multiple level disc bulge with varying degrees of foraminal stenosis and neural impingement." (R. at 394.) However, the undersigned has located no MRI from August of 2009, and Dr. Worsham's records from August of 2009 make no mention of sending Plaintiff for an MRI. (*See* R. at 373-74.)

Plaintiff did have an MRI on August 28, 2007. (*See* R. at 264-66.) The "impression" section of this MRI report, authored by Dr. Bryans, indicated as follows as to Plaintiff's cervical spine: "Generalized cervical spondylosis and facet osteoarthritis; there is multilevel disc bulge as noted above with varying degrees of central canal stenosis and neural foraminal impingement. There is some mild superior extrusion of disc material at the C2-C3 level but no free fragment." (R. at 265.) If the MRI to which Dr. Worsham refers in his February 2011 letter is the August 28, 2007 MRI, the undersigned notes that Dr. Worsham's record dated September 27, 2007 paints a different picture. (R. at 291.) His record states, "We had sent her for prior MRIs showing disc protrusion into the thecal sac at C2-C3 without any disc herniation, free fragmentation, or any neural foraminal difficulty." (R. at 291.) He also noted on that date that Plaintiff "has been very physically active." (R. at 291.)

The ALJ adequately addressed the August 2007 MRI, specifically noting Dr. Worsham's notes from September 27, 2007, and explained why Dr. Worsham's office notes support the "conclusion that the claimant's cervical and lumbar pain was not disabling during the period in question." (R. at 447.) Moreover, as the ALJ noted, Dr. Worsham's notes frequently indicate that Plaintiff's cervical condition is adequately controlled. (R. at 447.) For example, on February 26, 2009, Dr. Worsham noted that Plaintiff had "[s]ignificant . . . posterior cervical area tenderness, moderately controlled"; she was continued on her current medications. (R. at 368.) His notes from June 18, 2009, indicate that Plaintiff has "[s]ignificant . . . controlled cervical area pain." (R. at 372.) According to Dr. Worsham's record dated August 13, 2009, Plaintiff has "[c]hronic neck and back pain, fair to moderately controlled on medicines"; he continued Plaintiff on her current medication regimen. (R. at 373.)

The ALJ found that Dr. Worsham's opinion that Plaintiff should not lift more than one pound to be "baseless," stating, "Dr. Worsham notes nothing as a basis for that limitation except the <u>possibility</u> the claimant's cervical pain might increase." (R. at 448.) The ALJ further noted that Dr. Worsham, in his February 2011 letter, "admitted that the claimant's level of pain and limitation **<u>occurred quite gradually and that it was hard to say when she became impaired</u>** at the level he estimated with his lifting limitations." (R. at 448; *see also* R. at 394.)[4] Nothing in this analysis is improper.

Finally, Plaintiff asserts that the "opinions of the non-examining, state agency consultants were not deserving of more weight than Dr. Worsham's opinions." (Dkt. No. 10 at 30 of 36.) Plaintiff points to the fact that the "examining specialists both provided opinions" on November 3, 2008, when Dr. Worsham's "opinions regarding Lester's physical impairments weren't rendered until 2010 and 2011." (Dkt. No. 10 at 31 of 36.) Plaintiff asserts that it is the "binding law of this Circuit" that "doctors' opinions that are based on an incomplete record cannot be given weight in contradiction to an opinion based on the complete record." (Dkt. No. 10 at 31 of 36.)

Contrary to Plaintiff's argument, "an ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ considered the entire evidentiary record and substantial evidence supports the ALJ's decision." *McAbee v. Colvin*, Civ. A. No. 6:13–2331–RMG, 2014 WL 7369510, at *12 (D.S.C. Dec. 29, 2014) (citing *Thacker v. Astrue*, Civ. A. No. 3:11CV246-GCM-DSC, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011), *adopted at* 2012 WL 380052 (W.D.N.C. Feb. 6, 2012)); *see also Dellinger v. Colvin*, Civ. A. No. 6:14-CV-1150-DCN, 2015 WL 5037942, at *6 (D.S.C. Aug. 26, 2015) (affirming the ALJ's decision to afford the opinions of the state agency consultants greater weight, noting that "[a]lthough there are admittedly some differences in the medical records and opinions that were not reviewed by the state agency

---

[4]The ALJ also noted Plaintiff's MRI of August 29, 2011, after the period in question. (*See* R. at 448; *see also* R. at 415-17.) The "impression" section of the MRI report, authored by Dr. Bryans, indicated as follows as to Plaintiff's cervical spine: "Minimal disc bulge at C5-6 without evidence for neural foraminal compromise. No additional abnormalities seen." (R. at 415.)

consultants, these records and opinions are largely consistent with the records and opinions that the consultants were able to review").

Here, the ALJ considered the entire record, and as detailed above, the ALJ's analysis of Dr. Worsham's opinions is supported by substantial evidence. Accordingly, the undersigned discerns no error in the ALJ's decision to give more weight to Dr. Hopkins than to Dr. Worsham. *See Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) ("In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." (internal quotation marks and citations omitted)); *see also* R. at 453-54, 347-54.

## B.    Credibility

Plaintiff also contends the ALJ's credibility analysis is not based upon substantial evidence because the ALJ "fail[ed] to provide adequate reasons for his credibility determination." (Dkt. No. 10 at 31 of 36.) In assessing Plaintiff's credibility, the ALJ stated,

> After careful consideration of the evidence I find that, during the period from April 24, 2008 through July 14, 2010, the claimant's medically determinable impairments could reasonably have been expected to cause <u>some</u> of her alleged symptoms. However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms during the period from April 24, 2008 through July 14, 2010 are not entirely credible for this period. The claimant's overall credibility during this period will be discussed at greater length below.
>
> . . .
>
> I find the claimant less than fully credible as to her level of mental and physical limitation from April 24, 2008 through July 14, 2010. One inconsistency concerns how long Ms. Lester can comfortably sit. Her Adult Function Report (Exhibit 3E) contained a number of boxes the claimant was to check off if the activity mentioned was limited by her impairments. She did <u>not</u> indicate that sitting for extended periods bothered her. However, at her 2010 hearing, the claimant testified that significant periods of sitting caused her excruciating pain and that she could not sit for more than 30 minutes, maximum. These two assertions are inconsistent. The claimant's 2010 hearing testimony was also internally inconsistent. At one point she testified that lying in bed was very painful for her, so much so that she could barely recline. Later in that same testimony, the claimant was describing what she did when she had migraine headaches. She indicated that, when a bad migraine struck, she would have to spend

14

5 to 7 days in bed. Either lying in bed provides some relief from pain or it does not–the claimant cannot have it both ways. The modest array of prescription pain medication the claimant took during the period in question is inconsistent with the intense, persistent and debilitating level of pain she claims to have endured during this period. The above, taken together, leads me to conclude the claimant is less than fully credible as to the period from April 24, 2008 through July 14, 2010.

(R. at 447, 454.)

Plaintiff notes the ALJ "rejected Lester's complaints because she neglected to check off" the box on the Adult Function Report indicating that sitting for extended periods bothered her, but at the 2010 hearing, she testified that sitting for extended periods caused her excruciating pain. (R. at 454; Dkt. No. 10 at 32 of 36.) Plaintiff asserts the ALJ's "reliance on the fact that [she] failed to check off the box for sitting on her Function Report is unreasonable" because "[l]eaving the questions blank is not the same thing as indicating no problems." (Dkt. No. 10 at 32 of 36.) As to Plaintiff's testimony about lying in bed, Plaintiff asserts the ALJ "mischaracterizes Lester's testimony and the record." (Dkt. No. 10 at 33 of 36.) She contends that the ALJ's comparison of her testimony "about her typical day suffering from severe back pain with her testimony of what she does when she has a severe migraine" is like comparing "apples to oranges." (Dkt. No. 10 at 33-34 of 36.) Plaintiff further asserts that the ALJ "failed to explain how [her] medications proved her incredible." (Dkt. No. 10 at 34 of 36.)

As stated in *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996), "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 594. First, the plaintiff must present "objective medical evidence showing the existence of a medical impairment(s) which results from the anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." *Id*. (internal quotation marks and citations omitted). The Fourth Circuit explained as follows:

It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated. *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only

15

the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.*; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.), *see* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it, *see* 20 C.F.R. §§ 416.929(c)(3) & 404.1529(c)(3).

*Craig*, 76 F.3d at 595; *see also* SSR 96-7p, 1996 WL 374186, at *3 (listing factors "the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements").

As noted above, the ALJ found Plaintiff "less than fully credible" because of an inconsistency with respect to how long Plaintiff "can comfortably sit." (R. at 454.) In her Adult Function Report, Plaintiff checked the boxes to indicate the following items were affected by her condition: lifting, squatting, bending, standing, kneeling, stair climbing, memory, concentration, and using her hands. (R. at 183.) She did *not* indicate the following items were affected by her condition: reaching, walking, sitting, talking, hearing, seeing, completing tasks, understanding, following instructions, and getting along with others. (R. at 183.) Plaintiff contends that the ALJ's credibility finding is erroneous because "[l]eaving the questions blank is not the same as indicating no problems." (Dkt. No. 10 at 32 of 36.) Here, however, Plaintiff did not leave the question blank. She clearly completed the question and in fact, checked off several boxes; she simply did not check the box for sitting. Reliance on this inconsistency was not improper. *See* 20 C.F.R. § 416.929(c)(4); 20 C.F.R. § 404.1529(c)(4); *see also Bishop v. Comm'r*, 583 F. App'x 65, 68 (4th Cir. 2014) (finding "that the ALJ's determination that [the plaintiff's] subjective complaints were not credible was supported by substantial evidence" where, *inter alia*, "the ALJ cited specific contradictory testimony"); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) ("To determine whether the claimant's testimony regarding the severity of her symptoms is credible, the ALJ may consider," *inter alia*, "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent

statements concerning the symptoms, and other testimony by the claimant that appears less than candid").

Plaintiff also asserts the ALJ erred in analyzing her credibility because the ALJ "mischaracterizes Lester's testimony and the record." (Dkt. No. 10 at 33 of 36.) She contends that the ALJ's comparison of her testimony "about her typical day suffering from severe back pain with her testimony of what she does when she has a severe migraine" is like comparing "apples to oranges." (Dkt. No. 10 at 33-34 of 36.) As noted above, the ALJ stated,

> The claimant's 2010 hearing testimony was also internally inconsistent. At one point she testified that lying in bed was very painful to her, so much so that she could barely recline. Later in that same testimony, the claimant was describing what she did when she had migraine headaches. She indicated that, when a bad migraine struck, she would have to spend 5 to 7 days in bed. Either lying in bed provides some relief from pain or it does not–the claimant cannot have it both ways.

(R. at 454.) Plaintiff complains that the ALJ's comparison of Plaintiff's testimony as to what she does on a typical day to what she does when she has a severe migraine headache does not render her incredible. (Dkt. No. 10 at 34 of 36.) Plaintiff points out her testimony that when she has a migraine, she takes medication that "knock[s her] out." (Dkt. No. 10 at 34 of 36.) Plaintiff states, "This does not mean that she would not have pain lying down if she would not have taken this strong medicine which 'knocks her out.'" (Dkt. No. 10 at 34 of 36.)

> The undersigned finds no error. At the 2010 hearing, the Plaintiff testified, *inter alia*,
>
> Q. Okay. Well, if you're at home and you have the ability to move like you want to to try to alleviate the pain, what do you do?
>
> A. I stretch out. I can feel the, I can feel the bone pop in place back there. I can stretch out, and it'll pop. And then I have to pull my knees up, like, sit down and pull my knees up. It takes some of the pressure off the back. And then stretch out, and then I get up and I have to walk around and just kind of walk–don't sit there all day. I can't sit there all day. I have to just get up and pace around.
>
> Q. Okay. When you say stretch out, do you mean lie down and stretch?
>
> A. Lay, lay down and stretch my legs out. And then I, I put them on a pillow or whatever, you know, to take some of the pain off.
>
> . . .

Q. What time do you usually get up in the mornings?

A. Now, I get up around–between 7:30 and 8. And–because I can't stay in the bed. I hurt so bad, I can't lay there. I have to get up and move around. Take my pain medicine, the medicine I'm supposed to take, and move around, and–I don't–I lay around on the couch. I can't lay in the bed.

Q. Okay. So, then you just kind of spend your day moving from the couch–

A. Back and forth.

Q. –to the chair?

A. Um-hum. Yes, ma'am.

(R. at 72-74.)

As to her headaches, Plaintiff testified that she takes Mepergan because she needs "something to knock [her] out." (R. at 76.) She testified that when she takes that, she is "supposed to be asleep, like, six to eight hours," but she would still wake up "like, four hours later." (R. at 76-77.) When asked how often she has to use Mepergan, she stated, "probably about three times a month." (R. at 77.) She testified she had intense headaches about three times a month; she stated,

> And I'm in the bed five to seven days. I mean, no–five to seven days, max. Because once I go in–get in the bed, I don't eat. I can't eat. I throw up. Then when I get–start coming off–the headache starts going away, it takes me two or three days to get back up to where I can do anything. I'm so weak and sick from that. Just disoriented, just in a daze. I feel like I've just lost track of time.

(R. at 78.) She stated she would be in the bed for several days at a time, three different times a month. (R. at 78-79.) She stated that she is "in the bed from the time it hits–I mean, they hit so quick, I just want to–I can't plan to go [anywhere]. I can't plan to travel or get–when they hit, I'm down. I'm down for the count. . . . I cannot see, and I'm in the bed until it starts easing up." (R. at 79.)

The undersigned finds no error. On the one hand, Plaintiff testified that she "can't lay" in bed very long at all. (R. at 74.) On the other hand, Plaintiff testified that when she has migraine headaches, she is in bed for several days at a time. (R. at 78-79.) While Plaintiff correctly points out her testimony that Mepergan makes her sleep, she also testified that while she is "supposed to be asleep, like, six to eight hours," she would still wake up "like, four hours later." (R. at 76-77.) Based

18

on this testimony, the ALJ was reasonable in concluding Plaintiff's testimony was not entirely consistent. The undersigned interprets nothing in this testimony to indicate that Plaintiff is, in fact, asleep the entire time she is in the bed.

Finally, the Plaintiff contends the ALJ erred in his credibility analysis because he "failed to explain how [her] medications proved her incredible." (Dkt. No. 10 at 34 of 36.) The ALJ stated, *inter alia*, "The modest array of prescription pain medication the claimant took during the period in question is inconsistent with the intense, persistent and debilitating level of pain she claims to have endured during this period." (R. at 454.) While the undersigned agrees with Plaintiff that the medications she took are not necessarily a "modest array," the undersigned finds no reversible error. As described above, the ALJ's other reasons for assessing Plaintiff's credibility are supported by substantial evidence. Accordingly, even assuming Plaintiff is correct that her array of pain medication does not render her incredible, the ALJ's credibility analysis as a whole is supported by substantial evidence. *See Johnston v. Colvin*, Civ. A. No. 9:13-cv-2098-BHH-BM, 2015 WL 893064, *3 (D.S.C. Mar. 3, 2015) ("Routinely, Courts have found harmless error where only one or a few reasons among many were improper, where the remaining bases constitute substantial evidence." (affirming Commissioner's decision and citing *Mickles v. Shalala*, 29 F.3d 918 (4th Cir. 1994)). Accordingly, having found that the Commissioner's credibility analysis is supported by substantial evidence, the undersigned recommends affirming the Commissioner's decision.

## **CONCLUSION AND RECOMMENDATION**

Based on the foregoing, this Court concludes that the findings of the ALJ are supported by substantial evidence and recommends that the decision of the Commissioner be affirmed.

IT IS SO RECOMMENDED.

July 20, 2016
Charleston, South Carolina

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE